Good morning, ladies and gentlemen. Our first case for this morning will be Riffey v. Governor Bruce Rauner. Mr. Messenger. Good morning, Your Honor, and may it please the Court. The SEIU took $31.8 million from over 80,000 personal assistants without their consent and without lawful authority for so assistance to recover their money through a class action based on the premise that while SEIU's fee seizures violated the First Amendment, personal assistants were not injured by those fee seizures unless they subjectively opposed supporting the SEIU. I submit this was incorrect as a matter of law for several reasons, the most straightforward of which is that each of these individual personal providers were deprived of money as a result of SEIU's First Amendment violations. But you know, there's a little bit of 20-20 hindsight in your argument. Here's what worries me. Most class actions that we see of this sort, the B-3 type of class actions, include some claims that are the kind of across-the-board, one-fell-swoop sort of claim that the Supreme Court discussed in the Walmart case, and then there's going to be a stage at which there are assessments of how much each person is due. And this case is quite different, of course, because the Supreme Court in Harris v. Quinn has resolved the across-the-board question. It's done. It's over with. You know, people were acting under a different understanding of the law at the time these monies were collected. But there's evidence in the record to show that some people in this class, I don't know how many, but some, perfectly happy to contribute some money to the union. Others felt very strongly that that should not be the case. So I don't see how, if you get into B-3 predominance and superiority, you can possibly prevail. Well, I submit, Your Honor, it comes down to the merits question of what is required to show a First Amendment violation. Is subjective opposition to the fee seizure required to show injury? Or is it merely a question of whether they want a remedy, the individual personal assessment? Well, right. And so your argument really conflates two questions. One, was there a violation? Supreme Court has resolved that question. That's fine. And two, were people injured by that violation? And it seems to me that there are a number of questions on the injury point that in no way undermine the notion that there was a violation. The court resolved it as it did. But I'm not so sure that you can just say because there was a violation, there was automatically an across-the-board injury that is equal to every last penny that was collected in fair share fees. Well, I agree that the existence of a violation does not necessarily prove there was an injury. Right. But here I submit that there was a class-wide injury, a common injury, because all these personal providers were, or personal attendants or assistants, were deprived of their money as a result of the First Amendment violation. But maybe not. I mean, they may have been happy to give the money anyhow. We don't have that counterfactual, right? Because at the time, the law said that a fair share assessment could be collected. We all understand that's not the case anymore. It was abolished the minute Harris v. Quinn was decided. But with that background, I mean, there are many instances in which people voluntarily contribute money to things that they regard as desirable in some fashion. Yes, but the critical factor here is no member of the class had voluntarily agreed to join the union or support the union when fees were deducted. But there was no occasion to ask them, was there? What we do have is indirect evidence that they would have said yes, since so many of them joined the union after Harris was decided. Well, we do have direct evidence because the SCIU actively solicited personal assistants to join the union. But under a backdrop where they knew that there would be a fair share collected, and so did they want to take the next step and join the union? Back in, you know, pick whatever year you want near the beginning of your class period. I just think that this is a what-if kind of world that we're dealing with, and you're assuming that everybody knew at the time that if they didn't join the union, zero would be taken from their paycheck. But that wasn't the world then. No, but at the time they did have the choice. Did they want to join or support the union and authorize doing it, or not do so? But they didn't. But they also thought that they could obtain, that they were going to have the fair share amount taken from their paycheck anyway. So I can certainly see if somebody says, do you want $12 or $24 taken from your paycheck, or $50 or $100? Somebody might say, well, the 50 is enough, or the 24, whatever the numbers are. And so I'm concerned that the basic evidence you're relying on to think that every single person would have refused to give even a penny to the union is, doesn't hold together for me. Well, I believe in a but-for causation analysis, looking at their injury, you ask, what would have occurred if the illegal conduct didn't occur? Right. And so the plaintiffs have come in to say if the illegal conduct had not occurred, many people would have voluntarily paid money to the union. But in looking at a causation analysis, you take away the illegal conduct. If SEIU would not have seized fees from these individuals, they would have retained their money to assume the counterfactual. Not really. Not really. The evidence shows that many of them would have given the money voluntarily to the union. I mean, I don't know if you've ever given any money to the public TV station in your area, but a lot of people do that. And even if they don't, they're going to hear the public TV station. So, you know, they voluntarily give money. Yes. But under the causation analysis here, it's too much to assume that but-for the fee seizures, in addition to that, there would have been additional solicitations, and in addition, individuals may have voluntarily agreed to give their money to SEIU. Why isn't this a question? I mean, we're here on abusive discretion review. The district court thinks that there are real factual questions embedded in this that will vary from person to person. And it's not that any particular individual who could show exactly what you're describing wouldn't be entitled to recover the money, just as these named plaintiffs have. If they can show that, that's fine. But there's no reason to think it'll be everybody. Well, the dispositive question here is a question of law, which is, what is required to show injury of a taking? Is it required? Well, I'm not sure that that's true. I guess a UCSB... Well, look, the Supreme Court, we usually figure, chooses its words pretty carefully, right? And in the first sentence of Harris, the Supreme Court framed the right here in terms of the state of mind of each of the employees, correct? What the court said was, the question presented was, does it violate the First Amendment to take fees from individuals who do not want to join or support the union? I believe that's the case. Individuals who chose not to join or support the union are individuals who did not want to join or support the union. Well, you seem to be transforming a procedural step that was not taken because of the understanding of the law at the time into a conclusion about the state of mind of those people. And in Mullin's against direct digital is one case but there are a number of cases in which we've indicated that class membership is something that needs to be measured objectively, not based on state of mind. So what's the objective indication of the state of mind here? Well, there's two answers, the first of which I submit that state of mind is not required, that the taking without consent establishes the injury, that the individuals had property taken from them without lawful authority and therefore subjective state of mind is irrelevant. Well, I understand that but let's contrast though, let's contrast an exercise of eminent domain power to create a new public park that turns out not to be authorized. The government grabs everybody's property. Well, some of those people may be willing to contribute voluntarily but we understand that seizing property in those situations is a taking of property. This seems to be a little different the way the court has approached it in Harris, focusing again on whether they wish to join or support the union when they were not asked. Well, they were asked if they wanted to join which I think is a critical fact here. But support too, don't forget the support part. And support. SCIU operated what's called an opt-in system. Their notices said we urge you to join the union and they give all the reasons why they should. It said if you decide not to join, you will be charged an agency fee and that's the choice that the individual personal assistant in the class made at the time of fee seizures. Right, and the agency fee gave them access to a long list of services that the union provided. So at the time they made that choice, they thought not to join the union gives me access to all of these services. No, it's full membership that gave them access to all the supposed benefits. No, no, no. There were two lists. There was the one list that went along that covered what the fair share fee represented and then there was a second list that listed and if you become a full member of the union, you get these added other things. And so when they made that choice to opt into union membership, they made it against a backdrop that that first list was all going to be available to them anyway. Well, the individuals who opted into union membership would be excluded from the class, at least from that point forward. I know. That's, I'm obviously not making myself clear. I will. But the point is that, in your eminent domain example, if they may, Your Honor, if the government did seize property through eminent domain of a group of landowners, I submit that all of them would be injured by virtue of the taking of property. To the extent there's individuals who didn't mind the taking of property, like they didn't mind the compensation, that simply goes to whether they want a remedy. But it doesn't go to whether there's injury. And here, if the question of whether an individual opposed the SEIU taking their money only goes to remedy, that's no barrier to class certification because among other things, that can be resolved through Can I ask you about our Gilpin case? Yes, Your Honor. You've distinguished in your brief, as I understand it, on the theory that a punitive remedy was being sought in that case. That label was applied, and it could be applied here as well, to what was simply a claim for restitution, right? And Gilpin involved a restitution remedy that, very importantly, included monies the union was lawfully entitled to collect. In fact, 91 percent of the remedy they sought was monies the union was lawfully entitled to collect, and this Court held that would confer a windfall on the individuals and therefore create a class conflict. Here, only compensatory damages were sought. Well, no. The reason that we held there was a class conflict was because of the effects that the remedy would have had on the union in that case, right? There is some language to the effect of the motivations of who would want a punitive remedy and who would not. But here, so going to the question of would an individual decide to opt out of a remedy due to concern for SEIU's financial well-being, first I consider that to be extremely speculative and, quite frankly, implausible, that many individuals would refuse to accept money from the SEIU due to concern that would somehow harm the union. And even to the extent there were, that's something that should be resolved through the opt-out procedure, which, for the first time, can give these individuals... Well, are you saying Gilpin was wrong? No, absolutely not. Gilpin was not wrong. Gilpin's distinguishable because in that case, a remedy was sought that included fees the union was lawfully entitled to collect. Here, it's not. Only compensatory damages are sought. And I think it's difficult to deny class certification for seeking what's a proper remedy under Section 1983, which is compensatory damages. You refer to the opt-out option if there were to be a class certification. I'm not clear exactly where we start, but if there were, if you had to redefine, had to start over again, for example, the first thing you would have to do is go through the litany that my colleagues are referring to of all the different reasons why someone may not want to be assessed or join the union or, I'll say, appreciate the benefit and all that sort of thing. In the opt-out procedure, would there be a set of options that could be listed, such as those where someone would have reminded reasons why they could and maybe should opt out? It could be required, but I don't believe it should be. I know that. I know it doesn't necessarily mean should be. I'm just looking at something that may accommodate others when you have a situation where there are quite a number of people who did not want to pay this. There are others who maybe one-time deal where they are actually a caregiver because it may be a relative or someone else, and that's the only time they do this. That's why they're in and out, because there's no question you have a huge variation in whatever the damages are to each individual. In terms of the money? Well, just in the three people that got awards, one was around $5,000, another was four, and another one won. There's a great range, Your Honor, yes. Yeah, and so that is certainly going to have to be determined at some point, and I'm just variation could include an effort for people to actually opt out for reasons, like I really want to be part of the union, or I think I really benefited from some of the things by being on that list where they would have withheld my money. Someone else may think, well, I'm only good for half of that. I don't know. I'm just looking at the variations if this thing were to go forward as a class action. I believe so, Your Honor. The district court has a great deal of discretion as to how to structure the opt-out procedures under Rule 23, so I submit that if the court found that proper to create various options as opposed to an all or nothing, that could be done. And in terms of the total amount taken from each provider, that's known. There's a very large spreadsheet, so the total amount is known, but that could be done through the opt-out procedure. So that total amount known is in existence then? Yes, Your Honor. And it would be your burden then to get that list and then notify, I guess, everybody who's going to get this mailing, 80,000 people maybe? Yes, Your Honor. That's going to cost a lot of money. I guess you know that. Yes, Your Honor. But that's a burden you'd have to accept. If you're going to do this, just to initiate it, it's going to be a pretty big ticket. Yes, Your Honor. Probably be done through a third-party company that specializes in such things, just given the number of people and the number of bad addresses and such. But yes, the notice could be structured in a way to give individuals various options. Thank you. All right. Thank you very much. Mr. Cronlund. May it please the Court. The District Court did not abuse its discretion in denying without prejudice the plaintiff's motion for class certification, which sought certification of an 80,000-member compensatory damages class. The District Court was right in its legal conclusion that the subjective views of individual home care workers would be relevant to a compensatory damages claim, and overwhelming evidence supported the District Court's factual finding that many of the proposed class members were union supporters who had no objection to paying their fair share to support the union. Now, let me turn to the legal issue first. Home care workers who valued union representation and the wages and benefits the union is able to negotiate, and would have paid their fair share for those services if it had been voluntary, suffered no First Amendment injury from the pre-Harris fair share system. They're like the drivers in New Hampshire who were proud to display their live-free-or-die license plates before Wooley v. Maynard held that the state couldn't compel display of the state motto. They didn't suffer any First Amendment harm from doing something that they had no First Amendment objection to doing. Wouldn't those be the people that opt out? Well, those would be the many fair share payers who were union supporters and had no objection to paying their fair share fee. And the evidence showed that when the union was able to contact people, about 80 percent became union members. The fair share payers were overwhelmingly people who the union hadn't been able to make personal contact with. When the union did make personal contact, they became union members. So let me ask you this about just the structure of class certification. Obviously, you go through the 423A factors. Obviously, we're in the B3 world at this point, which requires also superiority and predominance. And you also have the safety valve under B3 of the opt-out procedure. So at what point is it the case that somebody is about the homogeneity of the class with respect to the important characteristic that you should just say no to a class action altogether as opposed to saying, well, there are going to be some people who didn't mind having instant coffee in their Keurig cups, or there are going to be some people who didn't care about some other factor, leaky windows. Maybe somebody else was paying and they really couldn't care less. So at what point do you say this is just not a good class and this isn't something that will take care of these objectors through the opt-out procedure? Well, first, the opt-out procedure has never been seen as a substitute for showing that the 23 factors are met in the first place. It may work for a case where people are injured and the issue is whether they want a remedy, like the employees who supposedly like working unpaid overtime. The courts certify that class. If an employee really doesn't want to recover, they can opt out. But the opt-out process wouldn't prove whether people suffered an injury here in the first place. It would just show that they didn't return an opt-out notice, even if it's assumed that everyone in the class suffered an injury when they weren't given a choice, which we dispute. We think the injury is having to pay the money over your objection. They would still be like the suspended students in Carey v. Pipus, who may have been denied procedural due process, but they would have been suspended anyway, so they had no compensatory damages. Did they have a choice before the money was taken? Not in this case. The way the system worked pre-Harris, the state automatically deducted fair share fees because that was the system that, as this court held, was justified by the law at the time. So we don't have a record of what they would have done if they had been asked, except that the district court made a factual finding that a great many of them would have paid the fair share fees. So the district court was extrapolating backwards, right? That's after the fact. It's not just after the fact. There is evidence, for example, the declaration of the union president that continuously over time, about 80% of the people that the union contacted would sign membership cards. When did they contact them, this 80%? Well, during the entire class period, when new home care workers would come into the unit, when the union was able to contact, 80% would sign membership cards. The people who didn't were mainly people the union was unable to contact. In 2014, when the union did a membership drive, most people signed up, including most fair share payers who were still in the unit, became members and they were paying the political and ideological expenses of the union, even though after Harris they could pay nothing. And the district court could certainly conclude as a factual matter that a great number of the fair share payers were union supporters. In terms of the opt-out process, because of the amount of time that's gone by, it's not possible to rerun the clock backwards. The money paid for collective bargaining services that people received, it's not like the Suchina case about the current coffee where people were sold the cheap instant coffee instead of the fresh coffee and it was inherently less valuable. Here, the money, the fair share fees, by definition, paid everyone's proportionate share of collective bargaining costs that they received in services. Right, so the list I was looking at was in the supplemental appendix, page 34, but there's a list of 20 things that are covered by the fair share fee, and then there's an additional list of six more things, the non-chargeable activities. So I take it your position is that, I mean, this is explaining, these are the chargeable activities, so it's explaining how you come up with the fair share fee, but it also would indicate services, I suppose, that the employees are getting. Yes, and the declaration that's docked at 106 by the union's president explains that we wouldn't have been able to keep all these offices open, provide all these services, and do everything if we hadn't have been collecting the fair share fees. The presumption that the plaintiffs are asking the court to adopt is also contrary to in which the majority said that the union wouldn't collapse without fair share fees because people would step up and become members. It's also contrary to the presumptions in the Railway Labor Act cases, and Machinists v. Street, and Railway Employees v. Allen, in which the court declined to presume that non-members didn't want to pay for the union's political and ideological expenses, and said that a class couldn't be certified because there was no proof that the non-members would actually have objected to paying those expenses. It's contrary to Hudson, it's contrary to Abood, all cases in which the court declined to presume that people represented by a union didn't want to support the union's expenses. Let me ask you this, this is generally speaking, when we are looking at class actions, we try to define the class by means of objective criteria. Judge Hamilton mentioned that a few minutes ago. But if you look at that first sentence in Harris, and if you look at the theory that you are advancing, it doesn't look objective, it looks subjective, it looks as though the people who are those who've suffered some injury are people who subjectively, for whatever reason, you know, don't want to support the union. Maybe they just need the money, or maybe they hate unions, or maybe they don't see the point, you know, there could be reasons, I suppose. And so how do we square that circle? Is this an area, is the First Amendment an area where we use subjective criteria, or is there some way of reconciling these ideas? Well, there may be other cases in which class cert is appropriate, and as Your Honor mentioned at the start of the argument, this is a somewhat unusual case in that the Supreme Court already resolved the merits issue. And what the plaintiff sought certification of was a compensatory damages class, and their theory of case management was that the class would be certified, and without any proof of what the class members wanted, the union would pay $30 million. Judge Shah denied the motion without prejudice, and indeed made clear several times in his decision that he was not foreclosing a motion for class certification geared to common issues. For the union had a good faith defense to damages claim might be a common issue. He also didn't foreclose a more narrowly defined class based on some other objective criteria. We don't know if he was referring to the fact that 10,000 members of their proposed class are actually our current union members, but he didn't foreclose class certification. He denied without prejudice the particular motion that was made for an 80,000 member compensatory damages class, and he did so not only because of a lack of predominance, a lack of typicality, but also an adequacy problem in having plaintiffs who made clear that they would pursue the case even if it destroyed the union seeking a damages remedy that, as in Gilpin, was essentially punitive in that they're seeking to require the union to pay money to people who were union supporters who had no objection to paying their fair share fee to support the union. Yeah, but if you're talking to dismissal without prejudice, you basically have to start over, and I don't see what it would almost have to pull everybody in the union to then find out those people who would say no, I don't want to join or I don't want to do a fair share or something. So you would have to even come up with the names of people you could include in a class, and that's overwhelming for the plaintiff, and that's why I think the only way that could even be determined in a one-shot deal is with a fully informed opt-out, with those things why people would not want to be part of this remuneration, because what's common to everyone, they all had the money taken, different amounts, that's true, but that happened, and then later on things started to say, well, let's check with those people and we'll be more careful, and a lot of other things that happened, but initially, and for what period of time, I don't know for sure, was it six years? It was. Yeah, six years, and the money, the union got all that money, and now they, I mean, it's more than 30 million dollars, and that's a lot. It's not a matter of being punitive, it's just a matter of I would want to, in my view, which is apparently different, is that I think the opportunity for those people to express their willingness or recognition or whatever would be at the time of the opt-out, and a very specific opportunity to check that off, and if it's the same kind of numbers you're talking about, it would be overwhelmingly opting out, if that's the fact. At which point, they'd probably decertify, actually, when the opt-outs get big enough. It's not uncommon that when it comes to compensatory damages, you need some kind of one-by-one proof. That's not an uncommon situation, and we submit that... One-by-one to get $500, $1,000, $5,000. But we submit that the union would have a right to litigate whether people did or didn't support the union at the time, that just not returning an opt-out notice wouldn't conclusively prove what someone was thinking six years ago, and that if we put them on the stand and they said, well, at the time, I loved the union, I was happy to pay my fair share fee, they didn't experience any First Amendment injury. So it's not just a matter of offering them, do you want money or do you not want money? Well, it's got to be the injury. I mean, they took the money. I don't know how that can be anything other than the injury, unless someone says, well, it didn't hurt. Well, if this collective bargaining agreement had been written differently, if the workers had gotten a little bit less money in gross pay and the state had paid the union a lump sum to provide representational services, we wouldn't have a First Amendment issue. The First Amendment issue is the individual association of the workers with the contribution, and that's only an injury to the people who had some kind of First Amendment objection. So it's not just about the money. It's not a conversion case. It's a First Amendment case, and many people who had no First Amendment objection just didn't suffer any injury, like the drivers with delivery or die license plates. I see my time is up. I think Judge Mannion has further questions, or is that enough? All right, then thank you very much. Your time ran out, Mr. Messenger, but I'll give you a final minute if you would like to wrap up. And if you could address the Brotherhood versus Allen and street cases, that would be helpful. Yes, Your Honor. In terms of whether an objection can be required, two points. First, most importantly, objections were not required here. Irrespective of whether SEIU could have used an objection procedure under which you considered a full dues payer unless you object to paying less, the reality is SEIU did not utilize such an objection procedure here. So objections cannot be required when, in fact, SEIU never required objections to its fair share payments. And the second point is that even if SEIU did do it, it would be illegal. The Supreme Court in Knox cast a lot of doubt on the propriety of opt-in procedures, or I'm sorry, opt-out procedures, even with respect to individual employees who can, under current law, be compelled to pay some fees. But whereas here, where it's unconstitutional for the union to seize any fees from individuals without their consent, objections cannot be required. So, for example, the First Amendment prohibits the union from compelling its employees to support a political party. No one would say the state of Illinois could compel its employees to be Republicans or Democrats unless and until they object. Objections cannot be required where no fees at all can be exacted. But more importantly here, SEIU didn't require... Are you familiar with the old 2% club in Indiana? No, I'm sorry, Your Honor, I'm not. Okay, I drafted the executive order that put an end to it, but it's... In fact, that was the system in Indiana for quite a long time. Did you say the 2%? Yes. That you had, every employee had to pay? To the state party of the... Yeah, I had to do that. Yeah, right. Long time ago. Yes. Thank you, Your Honor. All right, thank you very much. Thanks to both counsel. We will take this case under advisement.